UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

LUCILLE A. MCAULIFFE,

                    Plaintiff,

                                              06-CV-0453

                    v.                        **DECISION**
                                              **and ORDER**

JOANNE BARNHART,
Commissioner of Social Security,

                    Defendant.

───────────────────────────────

## INTRODUCTION

Plaintiff Lucille McAuliffe ("Plaintiff") brings this action pursuant to the Social Security Act § 216(I) and § 223, seeking review of a final decision of the Commissioner of Social Security ("Commissioner"), denying her application for Disability Insurance Benefits. Specifically, McAuliffe alleges that the decision of the Administrative Law Judge ("ALJ") William R. Pietz was erroneous because it was not supported by substantial evidence in the record.

The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, on the grounds that the ALJ's decision was supported by substantial evidence. Plaintiff opposes the Commissioner's motion and cross-moves for judgment on the pleadings, or in the alternative for the case to be remanded. For the reasons set forth below, I hereby

reverse the decision of the Commissioner and remand this case to the Commissioner for calculation of benefits.

## BACKGROUND

On April 26, 2001, plaintiff Lucille McAuliffe, at the time a 58 year old former secretary, travel clerk, and cashier, applied for Social Security disability benefits claiming that she had become unable to work as of April 16, 1998 because of a heart condition, diabetes, ankle problems, and spinal disc problems (Tr. 75). Plaintiff's application was initially denied (Tr. 34). She then filed a request for a hearing, and on September 17, 2002, a hearing was held before ALJ William R. Pietz (Tr. 357-392). On November 14, 2002, the ALJ found that the plaintiff was not disabled (Tr. 15-22). This became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 17, 2006 (Tr. 5-7). This action followed.

## DISCUSSION

### I.   Jurisdiction and Scope of Review

Title 42, Section 405(g) of the United States Code grants jurisdiction to Federal District Courts to hear claims based on the denial of Social Security benefits. Mathews v. Eldridge, 424 U.S. 319, 320 (1976). Additionally, the section directs that the District Court must accept the Commissioner's findings of fact if those findings are supported by substantial evidence in the record. See Bubnis v. Apfel, 150 F.3d 117, 181 (2d Cir. 1998); see

also Williams v. Comm'r of Soc. Sec., No. 06-2019-cv, 2007 U.S. App. LEXIS 9396, at *3 (2d Cir. Apr. 24, 2007). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Section 405(g) thus limits the Court's scope of review to determining whether or not the Commissioner's findings were supported by substantial evidence in the record as a whole, and whether the Commissioner's conclusions are based upon an erroneous legal standard. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); see also Wagner v. Secretary of Health & Human Serv., 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not de novo and that the Secretary's findings are conclusive if supported by the substantial evidence).

The Commissioner asserts that his decision is supported by substantial evidence in the record, and moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2d Cir. 1988). If, after a review of the pleadings, the court is convinced that plaintiff can prove no set of facts in support of his claim which would entitle her to relief,

judgment on the pleadings may be appropriate. <u>See</u> <u>Conley v.</u>
<u>Gibson</u>, 355 U.S. 41, 45-46 (1957).

## II.   **Standard for Entitlement to Social Security Benefits**

Under the Social Security Act, a disability is defined as the
"inability to engage in any substantial gainful activity by reason
of any medically determinable physical or mental impairment which
can be expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than
12 months ..." 42 U.S.C. §§ 423(d)(1)(A) (concerning Old-Age,
Survivors', and Disability Insurance ("OASDI")); 42 U.S.C.
§ 1382c(a)(3)(A) (2004) (concerning SSI payments). An individual
will only be considered "under a disability" if her impairment is
so severe that she is both unable to do her previous work *and*
unable to engage in any other kind of substantial gainful work
that exists in the national economy. §§ 423(d)(2)(A) and
1382c(a)(3)(B).

"Substantial gainful work" is defined as "work that exists
in significant numbers either in the region where the individual
lives or in several regions of the country." <u>Id.</u> Work may be
considered "substantial" even if it is done on a part-time basis,
if less money is earned, or if work responsibilities are lessened
from previous employment. 20 C.F.R. § 404.1572(a) (OASDI);
20 C.F.R. § 416.972(a) (SSI). Work may be considered "gainful" if
it is the kind of work usually done for pay or profit, whether or

not a profit is realized. §§ 404.1572(b) and 416.972(b). Furthermore, "substantial gainful work" is considered available to an individual regardless of whether such work exists in his immediate area, whether a specific job vacancy exists for him, or whether she would be hired if she were to apply for work. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

When a claimant requests a Social Security disability hearing before an Administrative Law Judge, SSA regulations require the ALJ to perform a five-step sequential evaluation. Pursuant to this analysis:

(i)   if the claimant is performing substantial gainful work, she is not disabled;

(ii)  if the claimant is not performing substantial gainful work, her impairment(s) must be "severe" before she can be found to be disabled;

(iii) if the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry

(iv)  if the claimant's impairment (or impairments) does not prevent her from doing her past relevant work, she is not disabled;

(v)   even if the claimant's impairment or impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

20 C.F.R. §§ 404.1520(a)(4)(I)-(v) and 416.920(a)(4)(I)-(v). The ALJ in this case performed the required five-step evaluation and

determined that: (I) the plaintiff had not engaged in substantial gainful employment since her alleged disability onset date of April 16, 1998; (ii) the plaintiff had medically determinable impairments that included a history of coronary artery disease, lumbar radiculopathy at L5-S1, nonproliferative diabetic retinopathy with macular edema bilaterally, vitreous hemorrhage of the right eye and status post tri-malleolar fracture of the right ankle; (iii) the plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 and; (iv) the plaintiff was not able to perform her past relevant work as a cashier or travel agent but could perform her past relevant work as a secretary (Tr. 16-21).

### III. The evidence in the record demonstrates that Plaintiff is disabled.

The record indicates that plaintiff underwent an angioplasty in 1985 and triple bypass surgery in 1998 (see Tr. 130-35)). On April 14, 1998, plaintiff underwent a selective coronary angiography and left ventriculography via the right femoral artery (Tr. 119). At that time, Dr. John P. Visco at the Buffalo Angiographic Associates diagnosed her with significant severe triple vessel coronary artery disease, hypertension, and a positive stress test; he also noted that she had recurrent angina pectoris (Tr. 119-35). On December 15, 1999, Dr. Laurie L. Hill, a cardiologist, concluded that plaintiff exhibited left ventricular hypertrophy, aortic sclerosis, mild left atrial

enlargement, and possible mild diastolic dysfunction (Tr. 176). July 24, 2008, Dr. Hill determined that plaintiff had severe coronary artery disease (Tr. 169). On August 22, 2000, Dr. Hill noted that plaintiff had a mild reduction in exercise tolerance.

Plaintiff has a well-documented history of visual impairments. On May 22, 2001, Dr. Neelakshi Bhagat, an ophthalmologist, diagnosed plaintiff with diabetic retinopathy in both eyes and significant macular edema in both eyes (Tr. 183-187). In examinations dated November 30, 2001, December 14, 2001, January 15, 2002, January 22, 2002, February 19, 2002, April 16, 2002 and May 28, 2002, plaintiff complained to her treating physician, Dr. Montag, of "black cobwebs," "blurred vision," "black floaters or dots," and a "film" over her eyes (Tr. 325, 329, 331, 333, 337, 339, 341). As of the date of her administrative hearing, plaintiff had undergone eight laser eye treatments by Dr. Montag in an attempt to correct these impairments (Tr. 377).

In a July 25, 2002 a residual functional capacity ("RFC") evaluation was performed by plaintiff's primary care physician, Dr. Yasin, who considered plaintiff's documented visual impairments in his assessment (Tr. 267). He concluded that plaintiff's blurred vision was due to retinal hemorrhage, which was clearing up very slowly (Tr. 266). She was, therefore,

restricted because of her compromised vision when around hazards, such as machinery and heights (Tr. 267).

Plaintiff testified at her hearing that she had problems with her vision and stated that she could not read small type unless she used a magnifying glass (Tr. 367-68). Plaintiff also stated that she could read for only 30 minutes at most because her vision became blurred and was affected by floaters (Tr. 369). Furthermore, plaintiff testified that some days her eyes were filmy and that she was unsure if she would be able to alternate between reading for 30 minutes and taking breaks (Tr. 369-70). She testified that she is unable to read books due to her inability to read for a sustained period of time (Tr. 380). Plaintiff testified that "after a while [her] eyes get tired and so [she] [does not] even pick up a book anymore" (Tr. 380). In addition, plaintiff testified that she is unable to use a computer because the film over her eyes affects her ability to see the screen and she is unable to see a computer screen if there is a glare behind it (Tr. 384-85).

In addition to visual impairments, plaintiff was limited in her ability to sit and stand for extended periods of time due to back and ankle problems. In May of 2001, plaintiff broke her ankle and underwent surgery, followed by physical therapy (Tr. 226-229, 256). In 2002, she underwent repeated ankle surgery to remove screws inserted in the first surgery because they were causing

severe pain (Tr. 256-263,381). Additionally, plaintiff has a history of lumbar radiculopathy at L5-S1 for which she has received epidural steroid injections and chiropractic treatment (Tr. 142-154, 215-220). On May 7, 2001, Jeffrey Ciancetti, plaintiff's treating chiropractor, noted her current symptoms to include low back pain, left hip pain, radiating left leg pain, and a burning sensation in the left posterior thigh (Tr. 215-18). On August 6, 2001, Dr. Jitendra M. Sanghvi noted that plaintiff exhibited a slight narrowing of the disc space at L5-S and small anterior osteophytes in the lower thoracic and upper lumbar spine (Tr. 238).

Due to these impairments, Dr. Stephen D. Rycyna, in a July 25, 2002 RFC assessment, found that plaintiff was limited to less than two hours per day of standing and walking and due to chronic low back ache and ankle pain, she had to periodically alternate between sitting and standing to relieve the pain (Tr. 264-267). In a medical assessment dated August 11, 2002, plaintiff's treating chiropractor, Jeffrey Ciancetti, noted that plaintiff was capable of standing/walking for at least 2 hours in an 8-hour workday, sitting less than 6 hours in an 8-hour workday, and was to never crouch, crawl, or stoop (Tr. 285-89).

Plaintiff testified at her hearing that her ankle injury, in combination with her back problems prevented her from walking, standing, or sitting for extended periods (Tr. 384, 386). In

addition, she testified that if she was standing on her ankle for any period of time, she had to sit and the ankle would swell; however, if she sat too long, she suffered shooting pains down her leg due to her lower back pain (Tr. 381, 386).

I find that the record contains substantial evidence that plaintiff is disabled under the meaning of the Social Security Act

## IV. The ALJ's conclusion at step four of the sequential evaluation is not supported by substantial evidence.

At step four of the sequential evaluation process, the ALJ must determine whether a claimant's impairments prevent her from doing her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(IV), 416.920(a)(4)(IV). First, the ALJ will compare his or her assessment of the claimant's residual functional capacity with the physical and mental demands of the claimant's past relevant work. Id. § 404.1566(b). The ALJ may take testimony from a vocational expert to obtain evidence needed to determine whether the claimant can still perform her past relevant work. Id. § 404.1566(b)(2). A vocational expert also may offer expert opinion testimony in response to hypothetical questions about whether a person with the physical and mental limitations imposed by the claimant's medical impairments can meet the demands of her previous work. Id. In posing a hypothetical to the vocational expert, there must be substantial evidence to support the assumption upon which the vocational expert bases his or her opinion. See Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983). Moreover, in order

for the ALJ to consider the vocational expert's testimony, the posed hypothetical must accurately portray the claimant's individual impairments. <u>See</u> <u>Podedworny v. Harris</u>, 745 F.2d 210 (3d Cir. 1984); <u>Tennant v. Schweiker</u>, 682 F.2d 1150, 1155 (8th Cir. 1982); <u>see also</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 516 (9th Cir. 2001) ("[I]f the record does not support the assumptions in the hypothetical, the vocational expert's opinion has no evidentiary value."); <u>Hines v. Barnhart</u>, 453 F.3d 559, 566 (4th Cir. 2006) (vocational expert's opinion is not relevant or helpful if it is not "in response to proper hypothetical questions which fairly set out all of claimant's impairments.").

To determine if plaintiff could return to her past relevant work as a secretary, the ALJ consulted a vocational expert. The ALJ questioned both the plaintiff and the vocational expert before posing hypothetical questions to the vocational expert. Following this questioning, the ALJ asked the vocational expert if a person who could "read normal 10-point font, but shouldn't read more than 30 minutes at a time" and could "sit for 30 to 45 minutes at a time and then [] stand in place for about five minutes" could do secretarial work (Tr. 389). I find, however, that because the hypothetical question posed to the vocational expert was not based on an accurate portrayal of plaintiff's impairments, the ALJ committed error in posing the hypothetical, and in relying on the vocational expert's answer to the hypothetical.

A. The ALJ improperly developed the medical record regarding plaintiff' s visual acuity.

While examining the vocational expert, ALJ Pietz did not employ the proper legal standards. In attempting to determine what the plaintiff could or could not read because of her eye impairments, the ALJ handed her a piece of paper that is not identified in the record and asked her to read it aloud (Tr. 367). The ALJ said that he believed that the document was printed in "*normal* type" (Tr. 367) (emphasis added). He then asked the plaintiff to show the piece of paper to the vocational expert and the following exchange ensued:

ALJ: Can you tell me what font that is, by any chance?

VE:  That looks like New York about a 10-point font . . .

ALJ: A 10-point font. Is that – *would you say that's normal printing* or -

VE:  It can be normal 10 to 12 sometimes using a Helvetica or an Ariel of 12.

ALJ: So most *normal* print in letters and documents would not be smaller than that?

VE:  No, generally not.

ALJ: And what size font did you say that was?

VE:  That's 10-point.

(Tr. 367-68) (emphasis added). Here, the ALJ essentially defines "normal"-sized font, based upon: 1) his examination of the font on a piece of paper that is not identified in the record; and 2) the testimony of a vocational expert who is not qualified to make

such a determination. The ALJ's findings reflect an improper determination of a key factor necessary in assessing plaintiff's residual functional capacity (see Tr. 20). Thus, the ALJ improperly developed the record to establish what "normal" sized print is and whether or not plaintiff is capable of reading "normal" sized print for a sustained period of time. Further, the record does not reflect what, exactly, the plaintiff was referring to when she testified concerning the size print she could read.

Upon resuming his examination of plaintiff, the ALJ asked:

    ALJ: So you wouldn't have any trouble reading *normal* print, I guess, on a job, just if it's unusually small. Is that right?

    Plaintiff: Yes.
        . . .

    ALJ: [W]ould you read [a newspaper] for about 30 minutes or so?

    Plaintiff: Around that. Some articles, like I said, if it's – they're smaller in print, I just - you know, I'll leave and -

    ALJ: Well, you're talking about fairly small print I just showed you, right?

    Plaintiff: Well, that, to me, is a little bigger than fine print you see in the newspaper.

    ALJ (directed to the VE): Is this bigger than normal newspaper print?

    VE:  Well, that should be about - 10 point is about what they print at, too.

ALJ: That's what I would think. It looks to me like newspaper print size having spent a lifetime reading newspapers.

(Tr. 369-70). In this exchange, the ALJ defines the term of "normal" print and gives expert testimony as to the size of newspaper print. The ALJ then used this information in posing a hypothetical to the vocational expert:

ALJ: Assume a person is between 55 and 60, has a 12th grade education, is limited to just a sedentary capacity for exertion, can read normal 10-point font but shouldn't read more than 30 minutes at a time, can sit for 30 to 45 minutes at a time and then would stand in place for about five minutes. . . [O]ccasional stoop and twisting. And incidental squatting and stairs. . . Could such a person do the secretarial work?

VE: I believe a person could do that. It is rated as secondary and reading would be - you know, no one reads for 30 minutes in those jobs continuously. And certainly the ability to stand in those jobs five minutes to move around, you'd probably build that in on a normal -

ALJ: All right. . . .

(Tr. 389-90). As noted above, in posing a hypothetical to a vocational expert, there must be substantial evidence to support the assumption upon which the vocational expert bases his or her opinion. See Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983). Here, substantial evidence does not support the proposition that plaintiff is capable of reading "normal" print. Nor is there substantial evidence that plaintiff can read any particular sized font over a sustained period of time. The medical record does not reflect plaintiff's alleged ability to read "normal" print which

is essentially defined by the ALJ without reference to any defining evidence in the record. Therefore, it was error for the ALJ to establish the medical evidence he used in posing the hypothetical to the vocational expert. The ALJ, in making his disability finding, should not have considered the vocational expert's answer to the hypothetical because it was premised on incorrect information (see Tr. 20).

B.   <u>The vocational expert's testimony was not consistent with the Dictionary of Occupational Titles.</u>

The occupational evidence provided by the vocational expert "generally should be consistent with the occupational information supplied by the [Dictionary of Occupational Titles ("DOT"), published by the Department of Labor]." SSR 00-4p. If there is an "unresolved conflict between [vocational expert] evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." <u>Id.</u>  In the instant case, the ALJ's reliance upon the vocational expert's testimony was not in conformance with these standards.

On the question of whether plaintiff was capable of performing secretarial work, the following exchange took place between the ALJ and the vocational expert:

> ALJ: [O]n the jobs you've mentioned, cashier, travel clerk, secretary, would it be necessary to read print finer than this?

VE:  The cashier probably wouldn't be. The travel agent usually that's off a computer now which you can size to your -

ALJ: Uh-huh. View.

VE:  Uh-huh.

ALJ: Secretarial the same way. I would think that the travel clerk you might have some map reading there. . .

VE:  Uh-huh. . . . In the general secretarial work, the only place I could see if they assigned contracts but I don't know -

ALJ: Uh-huh.

VE:  - if they use today if it's just a pretty much a written contract, you know, with the name and what they're going to do for roofing

ALJ: Uh-huh.

VE:  There aren't a lot of sub-clauses.

ALJ: All right. And would she have to read more than 30 minutes steady at a time and will you sit down and read something for 30 minutes?

VE:  I wouldn't think anyone would do that. I wouldn't see that in a secretarial [sic] unless they were typing long contracts. But item - it didn't sound like that from the description that I had. . .

(Tr. 369-71). The vocational expert further testified that with respect to secretarial jobs, "No one reads for 30 minutes in those [secretarial] jobs continuously. . . ." (Tr. 390). Throughout his testimony, the vocational expert provided occupational evidence regarding secretarial work. The vocational expert also stated that his testimony was consistent with the DOT (see Tr. 391). However, I find that the vocational expert's testimony is not consistent

-Page 16-

with the DOT. The DOT's occupational definition of a clerical secretary indicates that such a position involves, <u>inter alia</u>, scheduling appointments, taking dictation, reading and routing incoming mail, locating appropriate files, composing and typing routine correspondence. <u>See</u> Dictionary of Occupational Titles, 4th edition, 1991, Department of Labor, listing 201.362-030. I find that the vocational expert's description of the requirements for secretarial work, including his determination that such a position does not require 30 minutes of continuous reading, is not consistent with the occupational information supplied in the DOT. Therefore, the ALJ should not have relied on the vocational expert's testimony. <u>See</u> SSR 00-4p.

I find that the ALJ committed error by misconstruing the evidence, particularly concerning the combination of plaintiff's visual impairments together with her ability to sit and stand, when presenting the vocational expert with a hypothetical question to determine if the plaintiff could return to her past relevant work as a secretary. I find, therefore, that the testimony of the vocational expert is unreliable with respect to plaintiff's ability to perform secretarial work.

## CONCLUSION

Having found the testimony of the vocational expert to be unreliable and inconsistent with the medical evidence in the record, I find that there is substantial evidence in the record

to find that plaintiff is disabled within the meaning of the Act. Accordingly, the decision of the Commissioner is reversed and remanded for calculation and payment of benefits.  Plaintiff's motion for judgment on the pleadings is granted.  The Commissioner's motion for judgment on the pleadings is denied.

ALL OF THE ABOVE IS SO ORDERED.


                              s/Michael A. Telesca
                              MICHAEL A. TELESCA
                           United States District Judge

Dated:    Rochester, New York
          July 25, 2008